**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE RODRIGUEZ, | ) | CASE NO. 1:21-cv-00703 |
| | ) | |
| Petitioner, | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| KEITH FOLEY, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Jose Rodriguez (Petitioner or Rodriguez), challenges the constitutionality of his conviction in the case of *State v. Rodriguez*, Cuyahoga County Court of Common Pleas Case No. CR-2013-579577. Petitioner, through counsel, filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on March 31, 2021. (R. 1). On August 13, 2021, Warden Keith Foley (Respondent) filed a motion to dismiss the petition as time-barred, alternatively arguing that the petition contains procedurally defaulted claims. (R. 9). On November 23, 2021, Petitioner filed a response. (R. 12).

## I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) ("State-court factual findings are presumed correct unless rebutted by clear and convincing evidence.") The Eighth District Court of Appeals (state appellate court) summarized the facts underlying Rodriguez's conviction as follows:

[*P4] On the evening of November 11, 2010, around 10:45 p.m., Nashad Atallah was fatally shot in an apparent robbery at the Salameh Market on Daisy Avenue in Cleveland, Ohio. According to the medical examiner, Atallah died from multiple gunshot wounds to the chest and abdomen with skeletal, visceral, vascular, and soft tissue injuries. The medical examiner observed that Atallah had three separate gunshot wounds and classified the manner of death as "homicide while working."

[*P5] Cleveland police recovered three spent 9 mm Luger casings from the scene and an empty Lay's potato chip bag outside of the market. Both were submitted for testing but no DNA or other forensic evidence was recovered. The witnesses' statements obtained by police revealed that two men with hoodies were seen fleeing from the scene. One witness testified as to seeing the perpetrators' hands when they were running out of the building and identified one as Hispanic and the other individual as African-American. It was also reported that a blue Chevy Cavalier was seen leaving the area following the shooting. The initial investigation did not lead to any suspects, and the case eventually went cold.

*Jonathan Lopez Unknowingly Implicates Himself to FBI Informant; Investigation Revived*

[*P6] Over a year following the homicide, Cleveland police detective Michael Smith, who had been investigating the Daisy Avenue crimes, received a telephone call from FBI special agent David Kohut regarding the case. According to Special Agent Kohut, an informant had contacted him and identified Jonathan Lopez as being involved in the Daisy Avenue crimes. The Cleveland police then elicited Special Agent Kohut's assistance in the investigation. Det. Smith testified that, after interviewing the informant and following up on his facts, the Cleveland police next conducted an undercover operation in May 2012, suiting the informant with a wire and then having him meet with Lopez, who owed the informant money for drugs.

[*P7] Cleveland police listened and recorded the conversation between Lopez and the informant while it was taking place. During the recorded conversation, Lopez admitted that he was involved in the homicide and mentioned Aaron (nicknamed "AT") as the shooter. Det. Smith testified that Lopez knew facts concerning the robbery and shooting that were not public knowledge. Lopez specifically mentioned that a struggle ensued with the victim, that the victim had been shot three times, and that no money was taken — information that had not been broadcast to the public. Lopez, however, never mentioned Rodriguez in the recorded conversation with the informant.

[*P8] Det. Smith spoke with Lopez on July 2, 2012. On the following day, Lopez came to the police station and met with both Det. Smith and Special Agent Kohut. The interview was cut short because Lopez indicated that he had to leave for

school; he was supposed to resume the interview later but Lopez never returned. Cleveland police arrested Lopez on July 17, 2012. On the following day, while represented by counsel, Lopez agreed to an "off-the-record" proffer. Det. Smith testified that Lopez denied any involvement with the robbery and shooting; instead, he implicated his first cousin, Rodriguez, who he referred to by his nickname, "Leo." Det. Smith further testified that Lopez provided the names of other individuals involved in the shooting, including an individual named "Aaron." Det. Smith testified that, following the taking of Lopez's proffered statement, he did not participate in the followup investigation because he retired from the Cleveland police department and transferred jobs.

[*P9] Special Agent Kohut testified that Lopez's proffered statement also identified other individuals being involved, including Eli Camacho — who was later determined to be in prison at the time of the Daisy Avenue offenses, "AD" ("Adrian Santiago"), and Jenson Sota. Lopez, however, did not mention Anthony Soto. According to Lopez's proffered statement, he blamed his cousin Rodriguez and claimed to have gotten his information from Rodriguez.

[*P10] Lopez was indicted on charges of aggravated robbery and aggravated murder in connection with the Daisy Avenue crimes on July 27, 2012. According to Special Agent Kohut, they went forward with the indictment on Lopez, despite his proffered statement pleading innocence because they had the recording where he was bragging about committing these crimes. Special Agent Kohut testified that the taped recording gave them probable cause to arrest Lopez.

[*P11] The Cleveland police continued with its investigation, even after Lopez was indicted.

*Investigation Leads to the Seizure of a Blue Chevy Cavalier tied to Anthony Soto*

[*P12] In September 2012, Detective John Morgan with the Cuyahoga County Sheriff's Office became involved in the investigation after being contacted to assist by Special Agent Kohut. Det. Morgan explained that the original homicide detectives assigned to the case had retired. Det. Morgan testified as to his role in the investigation, beginning with his review of the original homicide investigation reports. According to Det. Morgan, he reviewed all the statements provided by Lopez and then cross-referenced the criminal records of the individuals that Lopez identified, including "AD" — Adrian Santiago. Det. Morgan further explained that he had the original investigation file pulled involving Santiago's 2008 conviction for carrying a concealed weapon and improperly handling a firearm. The file contained information that revealed that a blue, two-door Chevy Cavalier had been involved. Det. Morgan testified that this caught his attention because of a witness's statement indicating that two males exited the store, ran, and jumped "into a blue Chevy two-door car." Det. Morgan then retrieved from the 2008 investigation file the license plate and VIN number of the blue Chevy

Cavalier involved in the offense, and ultimately obtained a search warrant to confiscate the vehicle.

[*P13] Det. Morgan testified that, on October 15, 2012, law enforcement officials executed the search warrant at the address of Soto's mother, the licensed owner of the vehicle. From Soto's mother, they learned that her son, Soto, was the primary driver of the vehicle in 2010. Soto was present when the police executed the search warrant on the vehicle.

*Special Agent Kohut Interviews Rodriguez Regarding Lopez's Allegations*

[*P14] Special Agent Kohut testified that he first interviewed Rodriguez on February 27, 2013, when Rodriguez appeared for the trial against Lopez that never went forward, and then again on August 6, 2013. During the August 2013 interview, Special Agent Kohut played Lopez's proffered statement, paying close attention to Rodriguez's reaction. According to Special Agent Kohut, Rodriguez "smirked a few times, and then he eventually laid his head on his hand." Special Agent Kohut further testified that Rodriguez indicated that he was "mad" about his cousin's allegations and then upon further questioning, "his eyes started to tear up, his voice started to get high and very low, so there was definitely what I observed, was a definite reaction."

[*P15] Special Agent Kohut also acknowledged that their investigation identified Jose Ortiz as a suspect, who law enforcement learned had been contacting potential material witnesses in the case against Lopez. The record further revealed that Lopez gave the name of Jose Aaron Ortiz in his proffered statement. Special Agent Kohut further acknowledged that he investigated whether Lopez's father, Felix Lopez, Sr., was harassing witnesses in his son's case and testified that he told Felix to leave witnesses alone.

*Soto Provides Proffered Statement Implicating Himself, Rodriguez, and James Moore*

[*P16] In September 2013, approximately one year after seizing the blue Chevy Cavalier, Det. Morgan learned of Soto's desire to talk about the homicide and robbery that occurred on November 11, 2010. At this time, Soto was not under indictment. On October 4, 2013, Soto, while represented by counsel, gave a proffered, written statement. Det. Morgan testified that Soto provided a handwritten admission of the events that occurred on Daisy Avenue, implicating himself, Rodriguez, and James Moore.

[*P17] Det. Morgan then investigated Soto's account of the events, speaking with various witnesses, including Keith Williams and Mirelsa Capeles a.k.a. "Princess." Princess corroborated Soto's story that he, Rodriguez, and Moore had all been hanging out at her and Keith's apartment on the evening of November 11,

2010. She testified that she heard Rodriguez talking to Moore about "robbing a Radio Shack," to which she told them that they were "dumb," prompting Rodriguez to tell her to mind her own business.

[*P18] Det. Morgan further testified that, while the case was pending against Lopez, Felix (Lopez's father) directed Det. Morgan to speak with Travis Light. Light led the investigation to Isela Vega, who provided a statement implicating Rodriguez.

[*P19] Shortly thereafter, on November 5, 2013, Soto and Rodriguez were indicted on the underlying charges, and the case against Lopez was dismissed. Following their indictments, Det. Morgan obtained a search warrant for both of their cell phone records covering the time period of the Daisy Avenue shooting. Det. Morgan testified that the state had not yet indicted Moore, who was then at Northcoast Behavioral Healthcare and not competent to stand trial.

*Lopez Denies Any Involvement in the Underlying Crimes at Trial But Cannot Recall What Rodriguez Told Him About The Daisy Avenue Crimes*

[*P20] Prior to trial, the state filed a motion to have Lopez declared an adverse witness. Over defense counsel's objection, the trial court granted the motion, and the state called Lopez at trial.

[*P21] Lopez, age 23 at trial, testified that Rodriguez was his first cousin and that prior to November 2010, they had regularly kept in contact, seeing each other on the weekends and communicating by text message and phone calls. According to Lopez, they maintained a "very close relationship."

[*P22] Lopez testified that he had a "cordial conversation" with his cousin regarding the Daisy Avenue crimes but could not remember any of the details. Lopez acknowledged providing a written, proffered statement to law enforcement on July 18, 2012, but could not remember the contents. The prosecutor proceeded to read excerpts from Lopez's statement, including references to Lopez stating that Rodriguez told him that "[he] robbed the store on Daisy" and that "[he] shot the guy, killed him * * * [Rodriguez] was just stressing about the whole situation." Lopez, however, repeatedly indicated that he did not remember.

[*P23] Lopez also testified that he was not present at the Salameh Market on November 11, 2010, despite telling the police in one of his earlier statements that he had been. On cross-examination, he further agreed that he had indicated in his statement that his cousin "would never really tell me anything personal."

*Codefendant Soto Testifies at Trial and Directly Implicates Rodriguez in the Robbery and Murder*

[*P24] Soto testified at trial. At the time of trial, he was 24 years old and working as the general manager of Panera in Highland Heights. He testified as to the events leading up to the homicide on Daisy Avenue. On that evening, he went to Keith's apartment on Fulton Avenue, where a group of people was already hanging out — AD, Moore, and Princess (Keith's girlfriend who lived there). According to Soto, Rodriguez showed up sometime after him. Keith left for work around 10:00 p.m. but the rest of them stayed, playing cards, smoking, and talking about being "short on cash." The conversation led to "doing a robbery," and Moore pulled out his gun, showing both Rodriguez and Soto. Soto further testified that Rodriguez brought up the market on Daisy and then they all discussed robbing that store, prompting the three of them to leave and drive to the market.

[*P25] Soto drove the vehicle, a blue Chevy Cavalier (two-door) and parked it in the alley near the market. Soto walked inside the market "to check what's going on in the store," while Rodriguez and Moore remained in the car. Once inside the market, Soto bought a bag of chips and then returned to his vehicle and told Rodriguez and Moore that there was only one clerk inside. Soto then looped around Daisy one more time and ultimately parked between Daisy Avenue and Library Court alley, facing south. Soto turned off his lights but left the engine running while Rodriguez and Moore exited the car and entered the market store with bandanas covering their faces from the nose down. Soto testified that they were running back to his car "two, maybe three minutes" later. Once inside the car, Rodriguez was cursing and very worked up, asking Moore "why did you shoot the guy?" Moore responded by saying, "I had to, he resisted."

[*P26] They all three then drove to Taco Bell, where Keith was working. They stayed there for maybe ten minutes and then returned to Keith's apartment for another brief amount of time. Soto testified that he then headed back toward his mother's residence, off of West 117th Street, driving around first while his mind was racing. He testified that he did not want to go home right away.

[*P27] According to Soto, Rodriguez called him the next morning and told him that the clerk died. The news of the clerk's death put Soto in "self-preservation mode." He placed his car on the third floor of the parking garage near his work and rode the bus to work. He told his mother that his car "broke down." He "laid low" for a while and stopped hanging out with his normal group of friends, including Rodriguez and Keith.

[*P28] On cross-examination, Soto acknowledged that he believed he was in trouble when law enforcement agents came to his house to seize the Chevy Cavalier. That encounter prompted him to retain an attorney. Prior to giving his proffer statement, he further acknowledged that he believed that he had been identified as the driver of the vehicle and that he was concerned about a potential life sentence. Soto also admitted on cross-examination that some of the facts in his September 5, 2013 statement were false, such as Keith being at the apartment

with them after the shooting or that they all hung out together for a couple of hours following the shooting. Soto testified that he was indicted on November 5, 2013, along with Rodriguez, but that he had been released on bond by paying $2,500 where Rodriguez was kept on a million dollar bond.

*Cell Phone Records Place Rodriguez's and Soto's Cell Phones in the Vicinity of the Salameh Market and Corroborate Soto's Account*

[*P29] The state also offered the testimony of Todd Wiles, a civilian crime analyst with the Cleveland Police Department, who analyzed and mapped the cell phone records of Soto and Rodriguez relating to a four-hour period beginning on November 11, 2010 at 9:00 p.m. and ending the following morning at 1:20 a.m. Wiles testified that the cell phones identified as being used by Rodriguez and Soto were both located in the cell tower sector that covered the Salameh Market on Daisy Avenue around the time of the crimes. Specifically, Wiles identified Rodriguez's cell phone as being in the Daisy Avenue area at 10:31 p.m., 10:34 p.m., and 10:42 p.m. and then jumped to 10:46 p.m., 10:47 p.m., 10:48 p.m., and 11:00 p.m., placing that cell phone in the Fulton, Memphis area.

[*P30] Similarly, records revealed that Soto's cell phone was utilizing a tower at 10:41 p.m. near MetroHealth, which is near Daisy Avenue, and that the cell phone was still in that area at 10:42 p.m. At 10:51 p.m., the records indicate that Soto's cell phone had moved away from the sector that covers Daisy Avenue and had moved southwest in the area of Fulton and Memphis. According to Wiles, at 11:00 p.m., "maps indicating that the cell phones are bouncing off the same sectors of the same antenna on the same tower." At 11:04 p.m., Soto's cell phone called Rodriguez's cell phone and Soto's cell phone started traveling north out of the Memphis, Fulton area. Wiles further testified that the two cell phones "appear to be making calls in the same general area up until roughly midnight," but that by 1:00 a.m., Soto's cell phone was in Lakewood and Rodriguez's cell phone remained in the Detroit-Shoreway area.

[*P31] On cross-examination, Wiles acknowledged that the cell phone records cannot pinpoint a person's exact location; rather, the records can only place the phone in a general sector area. He further stated that each sector includes a radius spanning from five to 20 blocks and that sometimes a person could be in sector A but the call is being connected to sector B.

*Isela Vega Testifies that Rodriguez Confessed to the Shooting*

[*P32] The state called Isela Vega, who reluctantly testified after being held in jail for two days on contempt charges for refusing to testify. She testified that she was "scared" to testify because she had children. Vega testified as to a specific conversation that she had with Rodriguez at her home wherein Rodriguez told her

> that "he went into a store" and "he killed somebody."[1] Vega further testified, however, that she did not remember anything more. The state then allowed Vega to read the statement that she provided to the police in October 2013 to refresh her memory. After reading the statement to herself, Vega testified further that Rodriguez told her that the guy that he shot had no money and that he was Arabic. She also stated that she "just remembered him asking for something to drink. I don't know what he did with it."
>
> [*P33] On cross-examination, Vega admitted that she did not know Rodriguez very well and that she had seen him maybe once or twice in her life. She further testified that Rodriguez came to her house on Carrington Avenue — off of West 130th Street. Vega confirmed that she knew Travis Light, who was her daughter's boyfriend, and that Light was instrumental in having Det. Morgan take her statement. Vega, however, denied Light being at her house when she encountered Rodriguez and denied any dice game going on there.
>
> [*P34] Defense counsel further questioned Vega regarding her statement, reading excerpts of it relating to her giving Rodriguez a gallon of milk and her questioning him why he needed it. In her statement, Vega described Rodriguez, fully clothed, pouring a gallon of milk all over himself in the shower and that he "told us he wanted to clean the gun stuff off his hands." In response to defense counsel's question, Vega denied being afraid to testify on the grounds that she might be charged with perjury.

*State v. Rodriguez*, 2015-Ohio-3875 at ¶¶4-21, 2015 Ohio App. LEXIS 3762 (Ohio Ct. App. Sept. 24, 2015).

## II. Procedural History

Petitioner, represented by counsel, does not challenge the accuracy of the Respondent's rendition of the procedural history in this matter. (R. 12, PageID# 2288-2299). As such, the court incorporates Respondent's following description of the state court procedural history verbatim. (R. 9, PageID# 50-54).

[1] The court's own review of the transcript confirms that Ms. Vega testified on direct examination that Petitioner came to her apartment looking for her adult sons, and that he admitted to her that he went into a store and killed somebody, (R. 9-9, PageID# 1919, 1922; Tr. 1438, 1441). She further testified that she warned her children to stay away from Petitioner after this incident. *Id*. Ms. Vega testified that Petitioner revealed to her that the man he shot was Arabic and had no money. *Id*. at Tr. 1443.

**A. State Conviction**

On November 5, 2013, the Cuyahoga County Grand Jury indicted Rodriguez on: one count of Aggravated Murder (R.C. 2903.01(B))(Count 1); one count of Murder (R.C. 2903.02(B))(Count 2); one count of Aggravated Robbery(R.C. 2911.01(A)(3)) (Count 3); one count of Robbery (R.C. 2911.02(A)(2)) (Count 4); one count of Felonious Assault (R.C. 2903.11(A)(1)) (Count 5); and one count of Felonious Assault (R.C. 2903.11(A)(2)) (Count 6). All charges carried a 1-year and 3-year firearm specification. (Exhibit 1, Indictment, Case No. CR-13-579577-B). Rodriguez pled not guilty to all charges. (Exhibit 2, Entry).

The case proceeded to trial, and the jury found Rodriguez guilty of all the charges and the 1-year firearm specifications, but not guilty of the 3-year firearm specifications. (Exhibit 3, Verdict Entry). Prior to sentencing, Rodriguez pro se filed a Notice of Misrepresentation. (Exhibit 4, Notice). He complained that his trial counsel was ineffective. *Id.* The court merged the Aggravated Murder, Murder and the two Felonious Assault counts, and also merged the two Felonious Assault counts and sentenced Rodriguez to: Life years in prison with the possibility for parole after 20 years for Aggravated Murder plus one consecutive year for the firearm specification; and 4 year [sic] in prison for Aggravated Robbery. The sentence for Aggravated Robbery was to be served concurrently with the sentence for Aggravated Murder for an aggregate prison term of 21 year to Life years [sic]. This entry was journalized on September 11, 2014. (Exhibit 5, Sentencing Entry, Case No. CR-14-579577-B)[.]

The trial court docket is at Exhibit 29. (Exhibit 29, Docket).

**C. Direct Appeal**

On September 25, 2014, Rodriguez through new counsel appealed to the Ohio Eighth District Court of Appeals, Cuyahoga County (Exhibit 6, Notice of Appeal Case No. CA-14- 101971). In his brief, Rodriguez raised the following assignments of error:

1. The trial court committed plain error in violation of appellant's rights to due process, a fair trial and right of confrontation, in violation of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution in permitting the prosecutor to read into the record the unsworn statements of witnesses.

2. The state's evidence was insufficient to support appellant's convictions.

3. Appellant's convictions are not supported by the manifest weight of the evidence.

4. Appellant was deprived of his constitutional right to effective assistance of trial counsel.

(Exhibit 7, Brief). The State filed a brief in opposition (Exhibit 8, Brief). On September 24, 2015, the Ohio Court of Appeals affirmed the judgment of the trial court. (Exhibit 9, Opinion; *State v. Rodriguez*, Eighth App. Dist. (Cuyahoga) No. CA-14-101971, 2015-Ohio-3875, 2015 Ohio App. LEXIS 3762 (Ohio App. Sept. 24, 2015)).

Rodriguez moved for reconsideration October 5, 2015. (Exhibit 10, Motion). The State opposed the motion. (Exhibit 11, Opposition). On January 12, 2016, the Ohio Court of Appeals denied the motion for reconsideration. (Exhibit 12, Entry). The Ohio Court of Appeals docket is at Exhibit 30. (Exhibit 30, Docket).

Rodriguez did not appeal to the Ohio Supreme Court.

**D. Post-Conviction Motions/Appeal**

Rodriguez pro se filed a "Motion to Correct a Facially Illegal Sentence" on August 16, 2018, arguing that:

1. Sentencing Court failed to attach firearm specification to a specific count after finding numerous firearm specifications merged, and failed to dispose of the one-year firearm specification on count 3, aggravated robbery, in its journal entry.

2. Sentencing Court failed to notify Defendant at sentencing if he violates post release control the Parole Board may impose a sentence of up to one-half of the stated prison term originally impose [sic], and to incorporate notification of five-years mandatory post release control, as well, the consequences for violating post release control on count 3 aggravated robbery.

(Exhibit 13, Motion). The State filed a brief in opposition (Exhibit 14, Response) and Rodriguez responded. (Exhibit 15, Response)(Exhibit 16, Motion for Leave).

On September 11, 2018, the court issued a Journal Entry granting Rodriguez's motion as to the one-year firearm specification, but finding that, since Rodriguez would be supervised during parole pursuant to the Aggravated Murder conviction, it was not necessary to impose post-release control for the Aggravated Robbery. The court denied Rodriguez's request for a de novo sentencing hearing. (Exhibit 17, Entry). The court issued a nunc pro tunc entry of the September 11, 2014 sentencing entry to clarify the disposition of firearm

specifications, finding that all one-year firearm specifications merged into the one-year firearm specification on the Aggravated Murder. (Exhibit 18, Entry).

The court held a hearing on November 28, 2018, and advised Rodriguez of the mandatory 5-years of post-release control ("PRC") on his September 4, 2014 sentence. (Exhibit 19, Entry). The court further granted Rodriguez's motion for leave to file a Crim. R. 33(A)(4) motion, but then denied that motion. *Id*. The same day, the court also issued a nunc pro tunc entry that advised Rodriguez of the 5 years mandatory PRC in the original sentence of September 4, 2014. (Exhibit 20, Sentencing Entry).

On December 24, 2018, Rodriguez pro se appealed to the Ohio Eighth District Court of Appeals, Cuyahoga County, (Exhibit 21, Notice of Appeal Case No. CA-18- 108048). In his brief, filed by new counsel, Rodriguez raised the following assignments of error:

1. The sentence the trial court imposed is contrary to law.

2. The trial court erroneously limited the scope of the re-sentencing hearing.

3. Defendant is guilty of the lesser-included offense of Involuntary Manslaughter, not Aggravated Murder or Murder.

4. Defendant did not receive representation by the counsel guaranteed by the constitution or Ohio law.

(Exhibit 22 , Brief). The State filed a brief in opposition (Exhibit 23, Brief) and Rodriguez replied. (Exhibit 24, Brief). On December 12, 2019, the Ohio Court of Appeals affirmed the judgment of the trial court. (Exhibit 25, Opinion; *State v. Rodriguez*, Eighth App. Dist. (Cuyahoga) No. CA-18-108048, 2019-Ohio-5117, 2019 Ohio App. LEXIS 5190 (Ohio App. Dec. 12, 2019)). The Ohio Court of Appeals docket is at Exhibit 31. (Exhibit 31, Docket).

On January 17, 2020, Rodriguez pro se filed a Notice of Appeal with the Ohio Supreme Court under Case No. 2020-0086. (Exhibit 26, Notice of Appeal). In his memorandum in support of jurisdiction, he raised the following propositions of law:

I. The clear mandatory language in Ohio Revised Code § 2929.14(b)(l)(g) requires that a sentence for a firearm specification be imposed for the "most serious of the offenses of conviction" and the duty to do so is mandatory upon the trial court, rendering a sentence that is not in compliance void, in violation of the defendant's right to due process of law to have a valid sentence.

> II. A sentence that is void for lack of proper statutory compliance cannot be correct by a nunc pro tunc entry and to limit the scope of a resentencing proceeding is a denial of due process of law.
>
> III. Due process of law under the Fifth and Fourteenth Amendments mandates that each essential element of a charged offense must be established and supported by sufficient competent and credible evidence to prove them beyond a reasonable doubt. [A]ny conviction that fails this mandate cannot stand and the failure to correct the verdict by the trial court constitutes a denial of due process of law.
>
> IV. Due process of law under the Fifth and Fourteenth Amendments mandates the trial court to provide complete jury instructions on all issues raised by the evidence and the defendant has a statutory right to expect such instructions and the failure of a trial court to do so constitutes a denial of due process of law.
>
> V. A defendant in a criminal case is constitutionally entitled to the effective assistance of counsel at all critical stages of the proceedings, and where counsel violates essential duties owed to his client and the client suffers prejudice thereby, reversal is required under the Sixth and Fourteenth Amendments.
>
> (Exhibit 27, Jurisdictional Memorandum). On March 31, 2020, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (Exhibit 28, Decision, *State v. Rodriguez*, No. 2020-0086, 2020 Ohio LEXIS 800, 2020-Ohio-1090, 141 N.E.3d 986 (Ohio Mar. 31, 2020)). The Ohio Supreme Court docket is at Exhibit 32. (Exhibit 32, Docket).

(R. 9, PageID# 50-54).

**E. Federal Habeas Petition**

Rodriguez, through counsel, filed the instant petition on March 31, 2021. (R. 1). The petition raises the following grounds for relief:

> **GROUND ONE**: Petitioner's due process rights were violated under the 5th & 14th Amendments when his convictions were not supported by sufficient evidence.[2]

[2] (R. 1, PageID# 5).

**Supporting Facts**:[3]

9) In this case, there was no evidence presented that demonstrated Mr. Rodriguez fired a gun, shot the victim, had any indication the victim would be shot, or had any intent or purpose to kill anyone that day.

10) Rather, Anthony Soto, a co-defendant, testified that an additional co-defendant, James Moore was the actual shooter the day of the offense.

11) Anthony Soto testified that "James [Moore] had – you know, that he felt he had to shoot the guy, because he felt like he was resisting, and he felt like he was reaching for a gun." *Trial Transcript* at 1003-04.

12) Anthony Soto also testified that later in the evening while the co-defendants were discussing the incident, he remembered "James [Moore] saying he was resisting. I thought he was reaching for a gun. I think I shot him in the shoulder." *Trial Transcript* at 1007-08.

13) As such, the State's evidence clearly established that Mr. Rodriguez was involved in the robbery that resulted in the death of the victim, but that James Moore was the shooter, that he killed the victim, and that Defendant had no intent to kill the victim.

**GROUND TWO**: Petitioner was denied his 6th Amendment right to effective assistance of counsel.[4]

**Supporting Facts**:[5]

24) In Mr. Rodriguez's case, trial counsel provided ineffective assistance such that he was not acting as the counsel guaranteed by the Sixth amendment, which deprived Mr. Rodriguez of a fair trial. Trial counsel was ineffective in failing to pursue a lesser included offense instruction for involuntary manslaughter. This is notable, because the actual killer in this incident ended up with a manslaughter charge and a flat time sentence, rather than a life sentence like Mr. Rodriguez.

25) Appellate counsel also provided ineffective assistance such that he was not acting as the counsel guaranteed by the Sixth Amendment, which deprived Mr. Rodriguez of a proper appeal. Appellate counsel was ineffective in failing to raise the issue of instructions on a lesser included offense or a new trial. Appellate counsel also failed to raise an assignment of error about the improper imposition of a sentence on firearm specifications or post-release control.

---

[3] (R. 1-1, PageID# 18, 20).

[4] (R. 1, PageID# 7).

[5] (R. 1-1, PageID# 21, 22-23).

> 26) Counsel at the re-sentencing hearing provided ineffective assistance such that he was not acting as the counsel guaranteed by the Sixth Amendment, which deprived Mr. Rodriguez of counsel during a critical stage of the proceedings. Counsel at re-sentencing failed to argue that Mr. Rodriguez should have been convicted of the lesser included offense of involuntary manslaughter or argue the previously filed Crim R. 33 Motion.

(R. 1, PageID# 5, 7; R. 1-1, PageID# 20, 22-23).

**III. Statute of Limitations**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997); *Watkins v. Warden*, No. 17-1388, 2017 WL 4857576 at *1 (6th Cir. Sept. 28, 2017) ("Actions arising under § 2254 have a one-year statute of limitations.") The relevant provisions of AEDPA state:

> (d)(1) A one year period of limitations shall apply to the filing of an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1) & (2).

**A. One-Year Limitation**

In the instant action, Respondent asserts that Rodriguez's petition is time-barred because he did not file within the one-year limitations period. (R. 9). As stated above, "the limitation period shall run from the latest of the date on which the judgment became final by the conclusion of direct review *or* the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Pursuant to Ohio Supreme Court Practice Rule 7.01(A)(1)(a), appeals must be perfected within forty-five (45) days.

On September 24, 2015, the state appellate court issued its decision affirming Petitioner's conviction on direct review. (R. 9-1, PageID# 168; Exh. 9). Rodriguez, as stated above, moved for reconsideration October 5, 2015. (R. 9-1. PageID# 200; Exh. 10). On January 12, 2016, the state appellate court denied the motion for reconsideration. (R. 9-1, PageID# 208; Exh. 12). Respondent maintains Rodriguez did not appeal the state appellate court's decision or denial of reconsideration to the Ohio Supreme Court; and Petitioner has not argued otherwise. Respondent further maintains that, even assuming the motion for reconsideration and the court's denial thereof extended the time to appeal to the Ohio Supreme Court, his conviction became final no later than February 26, 2016—forty-five days after the state appellate court denied the motion for reconsideration. (R. 9, PageID# 59). The Court agrees.[6]

Therefore, the statute of limitations commenced the following day on February 27, 2016. Absent any statutory tolling, Petitioner was required to file his habeas petition no later than

---

[6] Petitioner has not raised any argument that the statute of limitations started running on a later date. Rather, Petitioner has only argued that he should be granted the benefit of equitable tolling. (R. 12, PageID# 2290-2292).

February 27, 2017. Rodriguez did not file his habeas petition until over four years later, on March 31, 2021. (R. 1).

However, petitions filed more than one year after the conclusion of direct review are not always untimely. The AEDPA tolls the one-year limitations period during the time "'a properly filed application for State postconviction or other collateral review . . . is pending.' §2244(d)(2)." *Evans v. Chavis*, 546 U.S. 189, 191, 126 S. Ct. 846, 163 L. Ed. 2d 684 (2006); *Carey v. Saffold*, 536 U.S. 214, 122 S. Ct. 2134, 153 L. Ed. 2d 260 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003).

Rodriguez did not make any further state court filings until August 16, 2018, when he filed a "Motion to Correct a Facially Illegal Sentence." (R. 9-1, PageID# 210; Exh. 13). By that point, the statute of limitations had already expired more than a year earlier— February 27, 2017. State post-conviction filings, even if timely, cannot serve to toll a statute of limitations that has already expired. *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003). Section 2244(d)(2)'s tolling provision "does not ... 'revive' the limitations period (*i.e.*, restart the clock at zero); it can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Vroman*, 346 F.3d at 602 (citation omitted); *accord Eberle v. Warden, Mansfield Corr. Inst.*, 532 Fed. App'x 605, 609 (6th Cir. 2013) ("2244(d)(1)(A)'s one-year clock does not run anew after an Ohio appellate court denies a defendant's application to reopen his direct appeal due to ineffective assistance of appellate counsel.")

Therefore, the court concludes that the habeas petition is untimely. Petitioner has not argued that a state-created impediment existed or that the factual predicate of his claims did not become known until a later date. Indeed, a review of the Petitioner's petition demonstrates that

his grounds for relief are based solely on what occurred at the trial, including his trial and appellate counsel's performance.

**B. Equitable Tolling**

"AEDPA's limitations period is subject to equitable tolling, a doctrine that 'allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Hall v. Warden, Lebanon Correctional Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) (*quoting Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)). In *Hall*, the Sixth Circuit found that equitable tolling should be used only "sparingly" and only if the petitioner establishes: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way preventing timely filing. 662 F.3d at 749 (*citing Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549, 177 L. Ed. 2d 130 (2010)); *Graham–Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560–61 (6th Cir. 2000) (citations omitted) ("The federal courts sparingly bestow equitable tolling. Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.... Absent compelling equitable considerations, a court should not extend limitations by even a single day.").

In his traverse, Rodriguez argues that equitable tolling is warranted. (R. 12, PageID# 2291-2292). First, Petitioner's counsel inappropriately relies on dated case law, *Dunlap v. United States*, 250 F.3d 1001 (6th Cir. 2001), when discussing whether equitable tolling is appropriate. *Id*. In *Hall*, the Sixth Circuit expressly noted that "*Holland*'s two-part test has replaced *Dunlap*'s five-factor inquiry as the governing framework in this circuit for determining whether a habeas petitioner is entitled to equitable tolling." 662 F.3d at 750. Using the old *Dunlap* factors,

Petitioner asserts that he lacked "actual notice" or "constructive knowledge" of the filing requirements. (R. 12, PageID# 2291). Notice, however, is not an express consideration under the two-part *Holland* test. Moreover, Petitioner's argument is another way of suggesting that ignorance of the law surrounding AEDPA's statute of limitations should excuse his compliance with its requirements.

The Sixth Circuit has rejected the notion that ignorance of the law alone, including the lack of knowledge concerning filing requirements warrants equitable tolling. "[T]is court has repeatedly held that 'ignorance of the law alone is not sufficient to warrant equitable tolling.'" *Allen v. Yukins*, 366 F.3d 396, 403 (6th Cir. 2004) (*quoting Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991)); *accord Taylor v. Palmer*, 623 Fed. App'x 783, 788 (6th Cir. 2015). Furthermore, not only has Petitioner failed to identify any extraordinary circumstance that stood in his way of filing a timely habeas petition, the Petitioner's actions, or more accurately inaction, cannot be construed as the diligent pursuit of his rights. Petitioner, however, suggests that had he not been diligent, he would not have filed any post-conviction motions. (R. 12, PageID# 2291). But between February 26, 2016 (when his conviction became final) and August 16, 2018—a span of 902 days—Rodriguez took no action in state or federal courts. This does not constitute diligent pursuit of one's rights. Because Rodriguez has not satisfied either portion of the two-part *Holland* test, let alone the requisite both, equitable tolling would be inappropriate.

Finally, Petitioner asserts that equitable tolling should be applied to prevent a "fundamental miscarriage of justice." (R. 12, PageID# 2295). Petitioner, however, relies on a number of decisions that involved a procedural default rather than AEDPA's statute of limitations and/or claims of "actual innocence." Here, it is not a state procedural rule that bars consideration of Petitioner's claim (though his claims are also arguably defaulted) but rather a

failure to file timely under federal law. To the extent Petitioner's counsel intended to raise an actual innocence claim, that issue is addressed *infra*.

**C. Actual Innocence**

In *McQuiggin v. Perkins*, 569 U.S. 383, 386, 133 S. Ct. 1924, 1928, 185 L. Ed. 2d 1019 (2013), the United States Supreme Court held that actual innocence, if proved, may overcome the expiration of AEDPA's one-year statute of limitations. The Supreme Court noted that a claim of actual innocence is *not a request for equitable tolling* but, rather, a request for an equitable exception to § 2244(d)(1). *Id*. at 1931 (emphasis added). The *McQuiggin* court also reiterated the requisite standard for a credible claim of actual innocence. *Id*. at 1931. The touchstone of the inquiry is whether a petitioner's "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [him].'" *Id*. at 1933 (*quoting Schlup v. Delo*, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)). However, "tenable actual-innocence gateway pleas are rare." *McQuiggin*, 133 S.Ct. at 1928. In such cases, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 298.

Petitioner does not contest that there was evidence in the form of Mr. Soto's testimony that Rodriguez, Moore and Soto himself were involved in a robbery that resulted in the killing of a store clerk. (R. 1-1, PageID# 17). The petition also acknowledges that "[a]dditional individuals testified at trial that Mr. Rodriguez had allegedly admitted to the shooting and attempted to cover his potential involvement in the incident." (R. 1-1, PageID# 17). The crux of Petitioner's actual innocence argument, and the petition itself, is that Mr. Soto testified that it was Moore who shot and killed the victim rather than Rodriguez. (R. 1-1, 12). This argument fails to satisfy the *Schlup*

standard. First, Petitioner fails to identify any "new" evidence that was not presented at trial. Second, the court cannot substitute itself for the jury and find that Petitioner was actually innocent based on Soto's testimony, which the jury plainly rejected at least in part. Even when considering the merits of a sufficiency of the evidence claim, federal habeas courts "do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [their] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The court, under these circumstances, cannot find that there was new, reliable evidence that would excuse Petitioner's untimeliness.

## IV. Conclusion

For the foregoing reasons, it is recommended that Respondent's Motion to Dismiss (R. 9) be granted and Rodriguez's Petition be dismissed as time-barred.[7]

s/ *David A. Ruiz*
David A. Ruiz
United States Magistrate Judge

Date: January 31, 2022

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais,* 928 F. 3d 520, 530-31 (6th Cir. 2019).**

---

[7] Respondent alternatively raised a potentially meritorious argument that the grounds for relief are procedurally defaulted because they were never presented to the Supreme Court of Ohio on direct appeal, and that no procedural mechanism exists to do so now. (R. 9, PageID# 62-71). Because this court recommends dismissal on a clear failure to file within the AEDPA's one-year statute of limitations, the court, in the interests of judicial economy, declines to offer a recommendation on the default issue.